# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Khadar v. Bush | : | Civil Action No. 04-1136 (JDB) |
| Anam v. Bush | : | Civil Action No. 04-1194 (HHK) |
| Abdah v. Bush | : | Civil Action No. 04-1254 (HHK) |
| Al Qosi v. Bush | : | Civil Action No. 04-1937 (PLF) |
| Paracha v. Bush | : | Civil Action No. 04-2022 (PLF) |
| Deghayes v. Bush | : | Civil Action No. 04-2215 (RMC) |
| Mustapha v. Bush | : | Civil Action No. 05-0022 (JR) |
| Al Mohammed v. Bush | : | Civil Action No. 05-0247 (HHK) |
| El-Mashad v. Bush | : | Civil Action No. 05-0270 (JR) |
| Al-Wazan v. Bush | : | Civil Action No. 05-0329 (PLF) |
| Al-Anazi v. Bush | : | Civil Action No. 05-0345 (JDB) |
| Batarfi v. Bush | : | Civil Action No. 05-0409 (EGS) |
| Qayed v. Bush | : | Civil Action No. 05-0454 (RMU) |
| Al-Shihry v. Bush | : | Civil Action No. 05-0490 (PLF) |
| Aziz v. Bush | : | Civil Action No. 05-0492 (JR) |
| Al-Oshan v. Bush | : | Civil Action No. 05-0520 (RMU) |
| Tumani v. Bush | : | Civil Action No. 05-0526 (RMU) |
| Salahi v. Bush | : | Civil Action No. 05-0569 (JR) |
| Errachidi v. Bush | : | Civil Action No. 05-0640 (EGS) |
| Aboassy v. Bush | : | Civil Action No. 05-0748 (RMC) |
| Habashi v. Bush | : | Civil Action No. 05-0765 (EGS) |
| Khiali-Gul v. Bush | : | Civil Action No. 05-0877 (JR) |
| Muhibullah v. Bush | : | Civil Action No. 05-0884 (RMC) |

```
Wahab v. Bush            :  Civil Action No. 05-0886 (EGS)

Gul v. Bush              :  Civil Action No. 05-0888 (CKK)

Sohail v. Bush           :  Civil Action No. 05-0993 (RMU)

Tohirjanovich v. Bush    :  Civil Action No. 05-0994 (JDB)

Al Karim v. Bush         :  Civil Action No. 05-0998 (RMU)

Sarajuddin v. Bush       :  Civil Action No. 05-1000 (PLF)

Mohammed v. Bush         :  Civil Action No. 05-1002 (EGS)

Mangut v. Bush           :  Civil Action No. 05-1008 (JDB)

Hamad v. Bush            :  Civil Action No. 05-1009 (JDB)

Zuhoor v. Bush           :  Civil Action No. 05-1011 (JR)

Al-Hela v. Bush          :  Civil Action No. 05-1048 (RMU)

Mousovi v. Bush          :  Civil Action No. 05-1124 (RMC)

Khalifh v. Bush          :  Civil Action No. 05-1189 (JR)

Zalita v. Bush           :  Civil Action No. 05-1220 (RMU)

Ahmed v. Bush            :  Civil Action No. 05-1234 (EGS)

Ghalib v. Bush           :  Civil Action No. 05-1238 (CKK)

Bukhari v. Bush          :  Civil Action No. 05-1241 (RMC)

Saib v. Bush             :  Civil Action No. 05-1353 (RMC)

Hatim v. Bush            :  Civil Action No. 05-1429 (RMU)

Al-Subaiy v. Bush        :  Civil Action No. 05-1453 (RMU)

Sadkhan v. Bush          :  Civil Action No. 05-1487 (RMC)

Faizullah v. Bush        :  Civil Action No. 05-1489 (RMU)

Faraj v. Bush            :  Civil Action No. 05-1490 (PLF)

Khan v. Bush             :  Civil Action No. 05-1491 (JR)
```

| | | |
|---|---|---|
| Kiyemba v. Bush | : | Civil Action No. 05-1509 (RMU) |
| Idris v. Bush | : | Civil Action No. 05-1555 (JR) |
| Rabbani v. Bush | : | Civil Action No. 05-1607 (RMU) |
| Almerfedi v. Bush | : | Civil Action No. 05-1645 (PLF) |
| Kabir (Sadar Doe) v. Bush | : | Civil Action No. 05-1704 (JR) |
| Al-Rubaish v. Bush | : | Civil Action No. 05-1714 (RWR) |
| Al-Qahtani v. Bush | : | Civil Action No. 05-1971 (RMC) |
| Alkhemisi v. Bush | : | Civil Action No. 05-1983 (RMU) |
| Gamil v. Bush | : | Civil Action No. 05-2010 (JR) |
| Al-Shabany v. Rumsfeld | : | Civil Action No. 05-2029 (JDB) |
| Mohammed Othman v. Bush | : | Civil Action No. 05-2088 (RWR) |
| Al-Mudafari v. Bush | : | Civil Action No. 05-2185 (JR) |
| Alhag v. Bush | : | Civil Action No. 05-2199 (HHK) |
| Al-Shimrani v. Bush | : | Civil Action No. 05-2249 (RMC) |
| Al Sharbi v. Bush | : | Civil Action No. 05-2348 (EGS) |
| Zadran v. Bush | : | Civil Action No. 05-2367 (RWR) |
| Alsaaei v. Bush | : | Civil Action No. 05-2369 (RWR) |
| Razakah v. Bush | : | Civil Action No. 05-2370 (EGS) |
| Al-Ghizzawi v. Bush | : | Civil Action No. 05-2378 (JDB) |
| Awad v. Bush | : | Civil Action No. 05-2379 (JR) |
| Al Halmandy v. Bush | : | Civil Action No. 05-2385 (RMU) |
| Al Salami v. Bush | : | Civil Action No. 05-2452 (PLF) |
| Hussein v. Bush | : | Civil Action No. 05-2467 (PLF) |
| Al-Delebany v. Bush | : | Civil Action No. 05-2477 (RMU) |

Al-Harbi v. Bush                    :    Civil Action No. 05-2479 (HHK)


## MEMORANDUM ORDER


        In each of the Guantanamo Bay habeas cases pending in
this Court, the government has moved for approval of its plan for
reviewing documents seized from detainees as part of an
investigation of three apparently coordinated suicides in June
2006.  The plan calls for the use of a "Filter Team," walled off
from government investigators and prosecutors, that would review
the seized materials and set aside anything arguably protected by
the attorney-client privilege.  The motion is strongly opposed by
the petitioner detainees, many of whom have cross-moved for the
return of documents that have been impounded, or for contempt
sanctions, or both.  After considering the briefs of the parties
and reviewing the transcript of a lengthy hearing on the same
motion before Judge Richard Leon in August 2006, I have decided
to grant the government's motion.  This ruling will be without
prejudice to petitioners' cross-motions, which will be taken up
and decided at a later time.  The reasons for my decision are set
forth below.  My order will apply in each of the above-captioned
cases.[1]

---

        [1]In the Guantanamo habeas cases assigned to them, Judges
Friedman, Urbina, Sullivan, Kennedy, Kollar-Kotelly, Roberts,
Bates and Collyer have transferred the government's motion to me
for decision.

## BACKGROUND

In most of the Guantanamo habeas cases, communications between detainees and their counsel are governed by a protective order.[1]  The protective order facilitates counsel's access to their detainee clients with an eye to protecting national security interests.  Am. Prot. Order ¶ 2.  It sets forth procedures for all contact between detainees and their counsel, as well as rules governing counsel's exposure to classified information.  An implicit premise of the protective order is that communication between detainees and their counsel enjoys the protection of the attorney-client privilege.  See Am. Prot. Order ¶ 28 (noting that the presence of security officials "shall not operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections.").

Annexed to the protective order are Revised Procedures for Counsel Access.  These procedures address the logistics of counsel visits and attorney-client mail in greater detail.  Again, the attorney-client privilege is referenced only indirectly, such as in the definition of legal mail.  See Am.

---

[1]Amended Protective Order & Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba ("Am. Prot. Order"), originally entered by Judge Joyce Hens Green in fourteen of the Guantanamo detainee cases.  See Hamdan v. Rumsfeld, 04cv1519, Am. Prot. Order (Dkt. No. 58); Order (Dkt. No. 68).  The Amended Protective Order has since been entered in the cases of most other habeas petitioners.  See, e.g., Khalifh et al v. Bush et al, 05cv1189, Order (Dkt. No. 8).

Prot. Order Ex. A.II.E. (legal mail includes "privileged documents").  Legal mail sent by counsel to detainees is to be opened by a "Privilege Team" that searches the mail for prohibited physical contraband.  Compliant mail is to be forwarded to military personnel in sealed and marked envelopes; GTMO personnel are then to deliver these envelopes to the recipient detainee without opening them.  Am. Prot. Order Ex. A. IV.A.3-4.  The Revised Procedures also include rules for material that is taken in and out of legal meetings, classification review of information communicated by detainees to counsel, provision of paper for the drafting of legal mail by detainees, and the circumstances under which phone calls between detainees and counsel may be permitted.

On June 10, 2006, three Guantanamo detainees were discovered dead in their cells.  Respt's Mot. For Procedures Related to Review of Certain Detainee Materials & Req. For Expedited Briefing at 3 ("Respt's Mot.").  News reports suggest that the three detainees hanged themselves using torn bed sheets. Id.[2]  The triple suicides were the most recent and extreme incidents in a string of detainee security violations at the Guantanamo Bay facility.  On May 18, 2006, several detainees in a

---

[2]Citations to the parties' pleadings incorporate the sources relied upon therein.  Oddly, but perhaps to shield the names of witnesses having first-hand knowledge, the government's citations supporting the fact of the suicides are to media accounts.

communal housing facility ambushed and assaulted Guantanamo
guards with makeshift weapons; on the same day, two Guantanamo
Bay detainees overdosed on medications provided by the facility.
Id. at 4.  Guantanamo personnel have since uncovered systematic,
unauthorized stockpiling of medications by detainees.  Id.

The NCIS began investigating the apparent suicides
immediately.[3]  Declaration of Special Agent in Charge Carol
Kisthardt ¶ 3 ("Kisthardt Decl.").  Investigators started
searching the cells of the deceased detainees.  Id.  They found
what appeared to be handwritten suicide notes on the bodies of
the three detainees.  Id.  Another handwritten note related to
the suicides was discovered in a mesh wall of one of the deceased
detainees' cells.  Id.  The note discovered in the wall was
"written in Arabic on notepaper that had been stamped 'Attorney
Client Privilege,'" and the name used by the author differed from
the name of the deceased detainee who had lived in the cell.[4]
Id.

Investigators then broadened their search to include
other occupied cells in the same cellblock.  Id.  While searching

---

[3]Since "the U.S. Navy has primary jurisdiction over
Guantanamo Bay," the NCIS is responsible for criminal
investigations into all deaths occurring at the Guantanamo Bay
facility.  Respt's Mot. at 4.

[4]Before discovering possible abuses of the legal mail
system, JTF-GTMO authorities allowed habeas counsel to provide
detainees with paper for drafting legal mail. Respt's Mot. at 5.

the cellblock, investigators discovered handwritten notes they believed to be relevant, "potentially authored by at least two of the deceased detainees," in the cell of a detainee other than the three suicide victims.  According to Special Agent Kisthardt, many of these notes were written on stationery stamped with indicia of privilege: "Attorney-Client Communication," "Privileged and Confidential," etc.  Id.

After discovering three notes on the bodies of the deceased, one suicide-related note in the cell one of the deceased, and a number of relevant notes in a fourth cell on the same cellblock, the NCIS decided to "expand the scope of the search."  Id. ¶ 4.  According to Special Agent Kisthardt, the purpose of the expanded search was to "pursue logical investigative leads concerning the deaths of the three detainees and to determine whether other suicides were planned or likely to be planned."  Id.  The expansion of the search was quite dramatic: NCIS investigators seized <u>all</u> materials from the cells of <u>all</u> detainees in the entire Guantanamo facility.[5]  The materials collected weighed 1,100 pounds and included "personal

---

[5]While this was unquestionably a massive search and seizure, it is not clear whether the seizure involved "all materials in all enemy combatant detainees' cells," as described in the government's motion, or "all <u>handwritten</u> materials in all enemy combatant detainees' cells" (emphasis added) as described in the affidavit of Carol Kisthardt.  <u>Compare</u> Kisthardt Decl. ¶ 4 <u>with</u> Respt's Mot. at 6.

items and papers, including legal material and other
correspondence." Id.

NCIS investigators sorted the seized materials and
placed them into small bags labeled with detainee-identifying
information such as inmate number, camp, cell block, and cell
number. Supp. Dec. Carol Kisthardt ¶ 3 ("Kisthardt Supp.
Decl."). These small bags were then put into grocery-sized paper
bags. Id. Eventually the larger bags were taken to NCIS offices
and placed in sealed cardboard boxes in a secure setting. Id.
On June 18, 2006, NCIS investigators began sorting through the
bags. Id. at ¶ 4.

The scope of the initial sort is the subject of some
controversy. On July 7, 2006, the government represented that
"materials from bags pertaining to eleven detainees" were sorted.
Kisthardt Decl. ¶ 5. Over a month later, the government filed a
Supplemental Memorandum correcting this assertion. In fact, the
detainee-specific bags of "approximately 155 detainees" were
searched. Kisthardt Supp. Decl. ¶ 5. Investigators had not
searched the materials of eleven detainees, as originally
claimed, but had searched eleven bags containing material
belonging to 155 detainees. Id.

Materials contained in the first eleven grocery bags
were sorted as follows: materials "that appeared even remotely to
be possible Attorney Client Privileged information" were placed

- 9 -

in one pile, and materials with no indicia of privilege were placed in a second pile. Kisthardt Supp. Decl. ¶ 5. Materials deemed non-privileged were scanned for potential relevance to the suicide investigation. Id. Among the materials in this category, investigators discovered two items they considered relevant: a document containing information on tying knots, and, from a different cell, a "JTF-GTMO generated email that appeared to contain classified or sensitive information regarding cell locations of detainees as well as details concerning camp operational matters." Kisthardt Decl. ¶ 5. While searching through other materials taken from the cell in which the JTF-GTMO generated email had been found, NCIS found three envelopes marked attorney-client privileged. Id. Special Agent Kisthardt opened these envelopes and "looked at" but did not read the contents. Id. One contained a document with a "Secret" stamp crossed out and "Unclassified" written in its place, a second contained a document marked "FOUO" (presumably, for official use only), and a third contained documents without notable markings. Id. It was at this point that NCIS — faced with difficulties such as the multitude of languages represented in the documents, the large volume of materials, and the need for guidance in handling privileged materials — suspended further examination of the impounded materials. Id.

The government's own account of NCIS's activities paint a picture of an investigation that has been scattershot and disorganized. Not only did the government provide inconsistent accounts of what types of materials were impounded and the scope of its initial examination of those impounded materials, but it was more than a month before the government advised the court of its dramatic underestimate of the initial document review. Agent Kisthardt's attribution of this error to an "inadvertent oversight with respect to the wording of [the] prior declaration," Kisthardt Supp. Decl. ¶ 4, does not inspire confidence. Nor does Agent Kisthardt's explanation of how investigators chose the first eleven bags to sort: they were chosen because they "appeared to be among the lightest and least full." Id. ¶ 5. The petitioners' allegations of illogical, inconsistent, and perhaps improper activities on the part of NCIS up to this point are for another day, however. The question of whether and how NCIS may proceed from this point forward with its review of the 1,100 pounds of seized material is more pressing.

The government asks the Court to "establish procedures authorizing the review of impounded materials" that may be potentially subject to the attorney-client privilege and proposes the procedures it has in mind. Respt's Mot. at 1. A "Filter Team" would review and sort the impounded materials for relevance and for privilege. The Filter Team would have the same

qualifications required of the Privilege Team, Access Procedures §§ II.D, and would include Department of Defense attorneys or Navy JAG attorneys and "other personnel and translators who have not and will not take part in litigation or other proceedings involving detainees, and who will operate under appropriate non-disclosure obligations."  Respt's Mot. at 1-2.

The Filter Team would sort through the impounded materials with the following mandates: (1) material found to be irrelevant to the NCIS investigation will be returned to the detainee "if privileged attorney-client communication, or, otherwise, to JTF-Guantanamo for appropriate action;" (2) material found to be non-privileged and potentially relevant will be turned over to NCIS investigators; (3) material found to be at least arguably privileged and potentially relevant will be presented to the court and to detainee's counsel: such material will not be disclosed to anyone else without consent of counsel or court authorization.  Respt's Mot. at 10-11.  Like the Privilege Team created by the Access Procedures, the Filter Team would be permitted to disclose immediately any information regarding "an immediate and substantial harm to national security" or "imminent acts of violence" to officials involved in responding to such violence.  See Access Procedures §§ VII. A.,D.-F.

## JURISDICTION

- 12 -

Judge Leon's decision in <u>Boumediene v. Bush</u>, No. 04-1166, 2006 WL 2468077 (D.D.C. Aug. 28, 2006), was that, in those of his cases that are pending on appeal, he lacked jurisdiction to act; in cases in which the protective order was never entered, he had no basis on which to act; and, in cases that have been stayed pending the outcome of the overarching jurisdictional issues on appeal, prudential deference counseled against his exercise of jurisdiction. <u>Id.</u> at *1.

The jurisdictional picture is admittedly cloudy. The Court of Appeals has several cases before it addressing the rights of detainees at Guantanamo. <u>See, e.g.</u>, <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp. 2d 443 (D.D.C. 2005), <u>Khalid v. Bush</u>, 355 F. Supp 2d 311 (D.D.C. 2005). Among the questions currently pending on appeal is the scope of the jurisdiction-stripping provisions of the Detainee Treatment Act of 2005 ("DTA"), signed into law on December 30, 2005, Pub.L. 109-148, 119 Stat. 2739, in light of the Supreme Court's decision in <u>Hamdan v. Rumsfeld</u>, 126 S. Ct. 2749 (2006).

The DTA, among other things, amended 28 U.S.C. § 2241 to eliminate federal court jurisdiction over the habeas petitions of Guantanamo detainees, DTA § 1005(e)(1), and vested exclusive jurisdiction in the Court of Appeals for the D.C. Circuit to review "final decision[s]" of military commissions or the combatant status review tribunals. <u>Id.</u> § 1005(e)(2),(3).

Following the enactment of the DTA, the government argued in the Court of Appeals that this court no longer had jurisdiction over any habeas claims filed by Guantanamo detainees.  Detainees' counsel argued that the DTA's jurisdictional provisions do not apply to habeas petitions that were pending prior to the DTA's enactment.  In June 2006, before the Court of Appeals could decide the issue, the Supreme Court handed down its Hamdan decision, holding, among other things, that section 1005(e)(1) of the DTA did not strip federal courts of all jurisdiction over habeas petitions pending prior to the DTA's enactment, at least not pending habeas cases, like Hamdan's, that do not challenge "final decision[s]" of military commissions or the combatant status review tribunals.  Hamdan, 126 S. Ct. at 2769.  However, the Court did not decide whether the DTA vested exclusive jurisdiction in the Court of Appeals over habeas cases pending before the enactment of the DTA that do challenge "final decision[s]" of military commissions or the combatant status review tribunals.  Id. at 2769, n.14.  Until this question is resolved, the jurisdiction of this court over pending habeas claims remains unclear.

    Although the government has consistently challenged district court jurisdiction in the Guantanamo cases since the enactment of the DTA, it is the government that has come with these motions, seeking guidance "as a prophylactic matter."  Mot.

- 14 -

Hr'g Tr. at 10, Aug. 16, 2006.  The government's motion does not
assert that the district court lacks jurisdiction to rule.
Instead, it asserts that its request for a ruling is "without
prejudice" to its jurisdictional position.  Respt's Mot. at 2,
n.3.  Moreover, although the filing of an appeal is "an event of
jurisdictional significance," Griggs v. Provident Consumer
Discount Co., 459 U.S. 56, 58 (1982), district courts retain
jurisdiction in appealed cases to deal with ancillary matters
that do not impinge upon the subject of the appeal.  "The filing
of a notice of appeal...divests the district court of its control
over those aspects of the case involved in the appeal."  Id.
(emphasis added).  District courts retain jurisdiction over
aspects of the case that are not involved in the appeal.  See,
e.g., United States v. Queen,  433 F.3d 1076, 1078 (8th Cir.
2006); Securities Industry Ass'n v. Board of Governors of Federal
Reserve System, 628 F.Supp. 1438, 1440 n.1 (D.D.C. 1986)
(district courts retain jurisdiction to issue orders regarding
injunctions).  See also 20 James Wm. Moore, Moore's Federal
Practice, § 303.32[2][c] (3d ed.2006).  The government's request
to review detainee material is unrelated to the question of which
court has jurisdiction to review the merits of petitioners'
challenges to their detention.

        The "prudential deference" rationale of Judge Leon's
decision is acknowledged with respect, but my idea of prudence is

to give the government the guidance it seeks.  If jurisdiction
has been improperly asserted, the Court of Appeals will correct
the error.  If I do have jurisdiction, both sides will be better
off having received judicial guidance sooner rather than later.

### ATTORNEY-CLIENT PRIVILEGE

The attorney-client privilege is the oldest of the
privileges for confidential communications known to the common
law.  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); Hunt
v. Blackburn, 128 U.S. 464, 470 (1888).  The privilege exists to
encourage "full and frank communication between attorneys and
their clients." Upjohn, 449 U.S. at 389.  The Supreme Court has
long recognized that the privilege is "founded upon the
necessity, in the interests and administration of justice, of the
aid of persons having knowledge of the law and skilled in its
practice, which assistance can only be safely and readily availed
of when free from the consequences or the apprehension of
disclosure." Hunt, 128 U.S. at 470.

The privilege has been associated with the
constitutional right of prisoners to have access to the courts,
Bounds v. Smith, 430 U.S. 817 (1977); Lewis v. Casey, 518 U.S.
343 (1996), including the right of a prisoner to communicate
privately with his attorney. Mann v. Reynolds, 46 F.3d 1055,
1061 (10th Cir. 1995) (invalidating prison policy preventing
contact visits between inmates and attorneys because prison

"policies will not be upheld if they unnecessarily abridge the defendant's meaningful access to his attorney and the courts. The opportunity to communicate privately with an attorney is an important part of that meaningful access.") (quoting Ching v. Lewis, 895 F.2d 608, 609 (9th Cir.1990)); Bach v. Illinois, 504 F.2d 1100, 1102 (7th Cir.1974) ("An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important.  We think that contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."); Adams v. Carlson, 488 F.2d 619, 631 (7th Cir. 1973) (recognizing "that the effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context."); Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997) ("The taking of an inmate's legal papers can be a constitutional violation when it infringes his right of access to the courts. The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts."); Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) ("Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.").

The question of whether non-citizen detainees at Guantanamo have any constitutional protections, and, if so, what they are, is also now before the Court of Appeals. See Khalid v. Bush, 355 F. Supp. 2d 311, 323 (D.D.C. 2005)(appeal pending); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 464 (D.D.C. 2005)(appeal pending).  Even if these petitioners have no constitutional protections, however, the attorney-client privilege is of paramount importance for the promotion of "broader public interests in the observance of law and administration of justice."   Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998), quoting Upjohn, 449 U.S. at 389.  The government indeed does not deny that petitioners have a right to counsel, or that the privilege is applicable at Guantanamo, nor has it challenged Judge Kollar-Kotelly's holding that it "is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."  United States. v. Al Odah, 346 F. Supp.2d 1, 5 (2004).  The question, then, is not whether the attorney-client privilege exists at Guantanamo, but whether it is violated (or, using the petitioners' word, "abrogated") by the government's proposed procedures for reviewing detainee materials.

The scope of the attorney-client privilege is "guided by 'the principles of the common law . . . as interpreted by the

courts . . . in the light of reason and experience.'" <u>Swidler</u> at 403, citing Fed. Rule Evid. 501, <u>Funk v. United States</u>, 290 U.S. 371 (1933).  Traditionally, the privilege applies to confidential communications between the client and his or her attorney made in order to obtain legal advice.  <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976); 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 503.10 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997).  The privilege covers much more than "any sort of admission of criminal wrongdoing," and includes "matters which the client would not wish divulged," <u>Swidler</u> at 408.  There is no balancing test to define its contours.  <u>Id.</u> at 409.

    The privilege has limits, however.  It protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege," <u>Fisher v. United States</u>, 425 U.S. 391 (1976), and it "cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." <u>United States v. Goldberger & Dubin, P.C.</u>, 935 F.2d 501, 504 (2d Cir. 1991).  Moreover, the privilege is subject to exceptions.  The privilege does not apply to communications made in furtherance of committing a crime.  <u>United States v. Zolin</u>, 491 U.S. 554, 562-63 (1989); Weinstein's Federal Evidence, § 503.31.  It is also subject to a testamentary exception, under

which disclosure of otherwise privileged communications may be
permitted after the client's death in order to settle disputes
about the client's intent for his estate. <u>Swidler</u>, 524 U.S. at
405; <u>Glover v. Patten</u>, 165 U.S. 394, 406-408 (1897).[1]

      The hearing before Judge Leon illuminated the kinds of
documents currently in the possession of NCIS that may indeed be
privileged. Mot. Hr'g Tr. at 66-68, Aug. 16, 2006.[2]
Communications from attorneys to detainees are likely to be typed
and easily identifiable as such. Harder to identify will be
papers that are, or are intended to be, communications from
detainees to their attorneys. These are likely to be handwritten
in a language other than English. Some of them may bear the
names and addresses of counsel, but others may be notes or
journals, made for the purpose of communicating information to
their attorneys. <u>Id.</u> Such documents would be difficult for

_____

[1]At least three other exceptions have been recognized. The
privilege is inapplicable to communications relevant to a breach
of duty between an attorney and client, to communications
regarding an attested document to which the attorney is an
attesting witness, and to communications relevant to a matter of
common interest between joint clients, when offered in an action
between the clients. <u>See generally</u> Weinstein's Federal Evidence,
§ 503.21, § 503.33-503.34.

[2]I believe it appropriate to take judicial notice of the
proceedings before Judge Leon. Scheduling and conducting another
hearing on ground he has already covered would consume time and
resources unnecessarily.

anyone but the detainee and his lawyer to identify as a privileged communication, if indeed they are privileged.[3]

### PARTICULARIZED SHOWING VS. LEGITIMATE PENOLOGICAL INTEREST

Petitioners' first objection to the government's proposed procedures is that the government has not made a specific, individualized showing that there is a sufficiently compelling justification for invading the privilege.  Petitioners have cited no direct authority for the specific, individualized showing they say is required.  They support their point only by analogy to cases addressing the crime-fraud exception to the attorney-client privilege.  <u>See, e.g.</u>, Pet. Opp. to Respt's Mot. at 15-16 (No. 04-1254 Dkt. No. 177) ("Pet. Opp.").

The crime-fraud cases are inapposite.  They may become important at a later stage, if the filter team uncovers evidence that would support <u>in camera</u> review, <u>see Zolin</u>, 491 U.S. at 572, or the invocation of the crime-fraud exception.  At this point, however, the correct question is whether the government has demonstrated a "legitimate penological interest" in seizing and

_____

[3]A question recently answered in the negative by the Second Circuit is whether notes intended for an attorney are privileged if their content has not yet been communicated to the attorney. The privilege requires an attorney-client <u>communication</u>.  "A rule that recognizes a privilege for any writing made with an eye toward legal representation would be too broad...an outline of what a client wishes to discuss with counsel—<u>and which is subsequently discussed with one's counsel</u>—would seem to fit squarely within our understanding of the scope of the privilege." <u>U.S. v. DeFonte</u>, 441 F.3d 92, 94 (2d Cir. 2006)(emphasis added).

reviewing documents that may contain privilege, using procedures that may be expected to result in some inadvertent exposure of privileged material. Turner v. Safley, 482 U.S. 78, 89 (1987).

Courts have long deferred to actions of prison officials that are "reasonably related to legitimate penological interests." Kimberlin v. U.S. Dept. of Justice, 318 F.3d 228, 233 (D.C. Cir. 2003); Turner, 482 U.S. at 89; see also Overton v. Bazzetta, 593 U.S. 126 (2003) (courts owe "substantial deference to the professional judgment of prison administrators."). If and to the extent that constitutional protections are implicated by the government's proposed filter team review, a Turner-like analysis is instructive.

Most of the Turner test does not fit the context of these cases, but the "most important element" - a "valid, rational connection to the legitimate governmental interest put forward to justify it" - certainly does. Kimberlin, 318 F.3d at 233, quoting Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998), citing Turner, 482 U.S. at 89-90, (internal quotations omitted). The occasion of several closely-spaced incidents culminating in orchestrated suicides in a detainee population believed to be secretive and violent provoked a command decision to search every cell for documentary evidence of a widespread conspiratorial effort. The governmental interest, of course, is in discovering any plot and interdicting future incidents. The connection is

rational.  This court will not second-guess the command decision.

        The remaining elements of the <u>Turner</u> test have to do
with identifying alternative means of exercising the
"circumscribed right" and balancing the loss or diminution of
that right against the cost to the prison of accommodating that
right.  <u>Amatel v. Reno</u>, 156 F.3d 192, 196 (D.C. Cir. 1998),
citing <u>Turner</u>, 482 U.S. at 90.  The "right" in this case - if the
<u>Turner</u> test applies at all - would be the right of access to the
courts.  At worst, that right is burdened, or its exercise
chilled, by the seizure and review of documents.  Accommodating
alternative means of exercising that right, by allowing
petitioners' counsel or a special master to conduct an initial
review of the impounded materials, would be logistically complex
and - given the exigencies of the NCIS investigation -
unacceptably time-consuming.  For these reasons, I find that the
proposed procedures are reasonably related to the legitimate
penological interest in investigating the detainee suicides and
thwarting future prison disruption.

### OBJECTIONS TO THE FILTER TEAM

        Petitioners next point out that "taint teams" are
judicially disfavored.  They cite and rely on Judge Koeltl's
opinion and order in <u>United States v. Stewart</u>, 2002 WL 1300059
(S.D.N.Y. June 11, 2002), rejecting a government proposal for a

- 23 -

"privilege team" after considering the views of "at least three courts" that "opined, in retrospect, that the use of other methods of review would be better."  The <u>Stewart</u> case involved a warrant to search materials in a law office, the possibility that privilege team lawyers would encounter privileged materials from their own (different) cases, and a relatively small volume of documents.  Judge Koeltl did not conclude that a privilege team can never be an appropriate method for screening documents that may be privileged.  His problem in that case, like the problem in these cases, was to fit the method of review to the situation.  His solution -- to appoint a special master to do the job -- made sense in the context of the case before him.

The Sixth Circuit was more pointed in its recent opinion in <u>In re Grand Jury Subpoenas 04-124-03 and 04-124-05</u>, Nos. 05-2274/2275, ___ F.3d ___, 2006 WL 1915386, (6th Cir. 2006).  Reviewing examples of both inadvertent and malicious violations of taint team non-disclosure rules and inaccuracies in privilege determinations, the court concluded that taint teams "pose a serious risk to holders of privilege."  <u>Id.</u> at 10.  In that case, targets of a grand jury fraud investigation were allowed to conduct a privilege review of documents before turning them over in response to a subpoena.  At the outset of its discussion, however, the Sixth Circuit acknowledged that taint teams are typically used in "exigent circumstances" when the "potentially-

privileged documents are already in the government's possession"
-- words that did not describe the case before it, but that do
provide a reasonably accurate thumbnail sketch of the cases now
before me.  Id.

Petitioners are undoubtedly correct in arguing that the
government's Filter Team will not be able to recognize
privileged, possibly privileged, and non-privileged materials
with complete accuracy.  See Mot. Hr'g Tr. at 66-68.  Consider
the (likely abundant) example of notes handwritten in many
languages.  Even if these notes are all translated into English,
it is unlikely to be evident whether they were made in
preparation for a meeting with counsel, or actually communicated
to counsel,[4] or memorialize a prior conversation with counsel.
Even the most cautious of Filter Team attorneys is likely to make
mistakes when faced with documents bearing no indicia of
privilege.

No practical and effective alternative to the Filter
Team has been proposed, however.  The exigency of the NCIS
investigation, the volume of materials, and the logistical
problems of dealing with documents located at Guantanamo Bay
(where counsel are from all over the United States mainland) all
add up to a situation unlike that of any case that has been cited
to me.  Neither review by special masters nor pre-screening by

_____

[4] See US v. DeFonte, supra.

- 25 -

counsel for the detainees could be accomplished in a reasonable amount of time.[5]

## CHILLING EFFECT

Petitioners contend that the proposed Filter Team review will chill attorney-client communications. Pet. Opp. at 14. The challenges facing the development of attorney-client relationships between counsel and Guantanamo detainees are acknowledged. Counsel who have undertaken such representation are performing a very significant public service, for which the Court and the entire legal community is grateful. The chilling effect point is duly noted. Some chill seems likely; the depth is debatable. It cannot be allowed, however, to trump the

---

[5]There is no reason to think that a special master would be any more successful than a filter team at identifying privileged documents bearing no obvious privilege markings. Special masters are usually appointed when the materials for review "are not voluminous," and therefore are less useful in cases involving significant problems with time, manpower and multiple languages. United States v. Stewart, 2002 WL 1300059 (S.D.N.Y. June 11, 2002); Black v. United States, 172 F.R.D. 511 (S.D. Fla. 1997)(noting that when a Special Master was appointed to sort documents in a previous case, the initial review remained incomplete over two years after the seizure).

I have conducted no evidentiary hearing to assess the costs, complexity, and delays that would flow from choosing one of the alternative proposed by petitioners, and the subject was not explored in any detail in the hearings before Judge Leon. The government's cautionary concerns about the volume of material to be reviewed, the number of languages involved, and the prospect of delay, see, e.g., No. 04-1254, Dkt. No. 182 at 23-25, seem self-evidently to be well founded.

government's investigative requirements in this sensitive situation.

## OBLIGATIONS OF THE FILTER TEAM

The government's motion will be granted in the language proposed by the government,[6] without filigree, but the government is cautioned that meticulous records must be kept regarding each document seized and reviewed, including records reflecting copies made of such documents, their distribution and use, and chains of custody.  If privileged materials are inadvertently or improperly disclosed, <u>Kastigar</u>-like hearings, <u>cf.</u> <u>Kastigar v. United States</u>, 406 U.S. 441 (1972), may eventually be required.  Note that, in this Circuit, while the inadvertent disclosure of attorney-client privileged material constitutes a complete waiver of the privilege, court-compelled disclosure does not.  <u>In re: Sealed Case</u>, 877 F.2d 976, 980 (D.C. Cir. 1989).  Note further that the existing protective order preserves the privilege in certain circumstances that would otherwise trigger a waiver, presumably in recognition of detainees' lack of control over their legal communications, Am. Prot. Order ¶ 28.  To facilitate any later proceedings on petitioners' cross-motions, all documents that have already been disclosed to NCIS investigators should be marked and segregated.

---

[6]In each of the cases assigned to me, the government's companion motion to expedite briefing will be marked as moot by the Clerk.

- 27 -

For the reasons set forth above, Respondents' Motion for Procedures Related to Review of Certain Detainee Materials is hereby **granted**, and it is

**ORDERED**

1.    Respondents are hereby authorized to review any attorney-client communications between a Guantanamo Bay detainee and his counsel contained within the documents and materials pertaining to the detainee that have been impounded in connection with the investigation of the Naval Criminal Investigative Service related to detainee suicides of June 10, 2006.  Such review shall be conducted by a Filter Team composed of Department of Defense attorneys, intelligence, or law enforcement personnel and translators who have not taken part in, and, in the future, will not take part in, any domestic or foreign court, military commission, or combatant status tribunal or administrative review board proceedings brought by or against the detainees.

2.    A Filter Litigation Team is also hereby authorized. The Filter Litigation Team shall be composed of one or more Department of Justice attorneys who shall not take part or be involved in litigating the merits of the Guantanamo Bay detainee habeas cases or other cases brought by or against the detainees.

3.    The Filter Team may disclose such attorney-client communications to the Filter Litigation Team.

4.    The Filter Team and the Filter Litigation Team shall not disclose such attorney-client communications other than to the Court, except as permitted by counsel involved in the communication or by the Court. The Filter Team and the Filter Litigation Team, however, may disclose information pertaining to future events that threaten national security or involve imminent violence to the Commander, Joint Task Force-Guantanamo.

5.    Filings made by the Filter Litigation Team containing or disclosing information not subject to disclosure under this Order shall be made under seal through the Court Security Officers ("CSOs") assigned to these cases.  Such filings shall contain a conspicuous notation in substantially the following form, "Filed Under Seal – Contains Privileged Information."  The CSOs shall not serve such filings on counsel for respondents, except as authorized by petitioners' counsel or the Court.


                          JAMES ROBERTSON
                    United States District Judge